**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**In re: BUFFALO COAL COMPANY, INC.,**

    Debtor,

**JOHN W. TEITZ,** as Chapter 7 Trustee
for **BUFFALO COAL COMPANY, INC.,**

    Appellant,

v.                                               **Civil Action No. 2:10-CV-32
(BAILEY)**

                                                              Bankruptcy Case No. 06-0366
                                                             Adv. Proc. No. 08-41

**VIRGINIA ELECTRIC AND POWER
COMPANY, INC., d/b/a DOMINION
VIRGINIA POWER,**

    Appellee.

**MEMORANDUM OPINION AFFIRMING ORDER OF THE BANKRUPTCY COURT**

      Pending before the Court is an appeal by John W. Teitz, the Chapter 7 trustee for Buffalo Coal Company, Inc. ("Buffalo Coal") (collectively, the "debtor"), challenging the January 26, 2010, decision of the United States Bankruptcy Court for the Northern District of West Virginia in the debtor's adversary proceeding against Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion"). In that decision, the bankruptcy court granted summary judgment in favor of Dominion on the debtor's claim that Dominion tortiously interfered with one of the debtor's coal supply contracts. For the reasons that follow, the Court **AFFIRMS** the decision of the bankruptcy court.

1

**BACKGROUND**

I. <u>**Factual History**</u>

　　A.　　**General Background**

Dominion is a publicly-regulated utility, which operates the Mount Storm Power Station (the "Power Station") in Grant County, West Virginia, one of the largest coal-fired power generation facilities in its fleet. To operate the Power Station, Dominion contracts for coal with third-party suppliers on a regular basis. For several decades, Buffalo Coal served as such a supplier. However, in 2004 and 2005, Buffalo Coal began experiencing financial difficulties and, as a result, requested that Dominion agree to restructure their contractual relationship to increase the price to be paid by Dominion.

On October 27, 2005, Dominion and Buffalo Coal entered into a new coal supply agreement, the Primary Supply Agreement, which increased the price per ton that Dominion paid to Buffalo Coal. The agreement also included new default provisions whereby Dominion could terminate the agreement in the event of Buffalo Coal's insolvency or inability to pay its debts when due.

In 2005 and 2006, Mount Storm Coal Supply, LLC ("Mount Storm"), together with its affiliate, PC West Virginia Synthetic Fuel #2, LLC ("PACE"), operated a synthetic fuel production facility on property leased from Dominion at the Power Station (the "Synfuel Project"). Synthetic fuel is created through a chemical treatment process that changes the chemical composition of coal into a cleaner burning material that Dominion can use as an alternative fuel for the Power Station. Synthetic producers like Mount Storm qualify for federal tax credits to encourage production of these cleaner burning fuels. Dominion is not

an affiliate of Mount Storm or PACE. Dominion did not manufacture or produce synthetic fuel, nor did Dominion receive any tax credits for doing so.

To obtain the coal (generally called "feedstock coal") Mount Storm needed to produce synthetic fuel, it entered into contracts with coal suppliers that had existing relationships with Dominion. Through these agreements, referred to as Parallel Agreements, Dominion's coal suppliers would deliver a portion of their contractual obligations to Mount Storm, instead of Dominion. Buffalo Coal entered into such an agreement with Mount Storm. The termination of that agreement is the subject of this appeal.

### B. Synfuel Project Agreements

In addition to a lease agreement between PC WV and Dominion (R. 5), the Synfuel Project is composed of four agreements. Each of these agreements became effective on January 14, 2005.

First, Mount Storm and Dominion entered in a Coal Consulting Agreement (R. 28). This agreement required Dominion, among other things, to: (1) provide Mount Storm information regarding sources of coal (Id. at §6.2(a)); (2) discuss coal purchasing strategies with Mount Storm (Id. at §6.3(d)); (3) identify potential suppliers of feedstock coal to Mount Storm (Id. at §6.3(d)); (4) assist in the negotiation and discussion on behalf of Mount Storm regarding the terms of any feedstock supply contracts (Id.); (5) assist in administering feedstock supply contracts on behalf of Mount Storm (including pursuing any remedies under any such supply contracts) (Id. at §6.3(e)); and (6) coordinate and schedule all coal shipments with suppliers on behalf of Mount Storm (Id. at §6.3(f)).

Second, Mount Storm, PACE, and Dominion entered into a Handling Agreement (R.

30). Pursuant to this agreement, Mount Storm sold feedstock coal received by Buffalo Coal to PACE to be processed into synthetic fuel. (Id. at §4.2). Dominion agreed to provide certain material handling services, which included reviewing coal analysis reports and other documents from suppliers regarding shipments to ensure that the coal delivered conformed to Coal Quality Standards and the other terms of the supply contracts (Id. at §6.2).

Third, Mount Storm and Dominion entered into a Coal Sales Agreement (R. 31). Pursuant to this agreement, Mount Storm agreed to sell Dominion (or another party designated by Dominion) any coal acquired by Mount Storm that exceeded the quantities required by PACE at the synfuel facility. (Id. at §4.1).

Fourth, PACE and Dominion entered into a Synfuel Supply Agreement (R. 32). Pursuant to this agreement, PACE agreed to sell Dominion all of the synthetic fuel produced by PACE at the synfuel facility (Id. at §5.1).

Accordingly, through these final two agreements, all feedstock coal sold by any supplier to Mount Storm (including all coal sold by Buffalo Coal to Mount Storm) was ultimately purchased by Dominion, either directly as coal from Mount Storm under the Coal Sales Agreement or indirectly as synthetic fuel from PACE under the Synfuel Supply Agreement.

### C. Primary Supply Agreement and Mount Storm Parallel Agreement

On October 27, 2005, Dominion and Buffalo Coal entered into the Primary Supply Agreement (R. 33), pursuant to which Buffalo Coal agreed to supply coal to Dominion. The agreement also provided that, upon the request of Dominion, Buffalo Coal would enter into Parallel Agreements with third parties to sell all or part of the coal Buffalo Coal was obligated to deliver to Dominion under the Primary Supply agreement. (Id. at §11.13). In

4

other words, any coal sold under a Parallel Agreement would automatically reduce, on a corresponding basis, the quantity of coal that Dominion remained obligated to purchase from Buffalo Coal. (Id.). A Parallel Agreement was required to substantially mirror the terms of the Primary Supply Agreement. (Id.).

In November 2005, Buffalo Coal and Mount Storm entered into a Parallel Agreement, referred to as the Synfuel Feedstock Agreement (R. 34). Pursuant to this agreement, Buffalo Coal agreed to supply Mount Storm with coal based upon monthly orders. (Id. at §2.1). While the agreement provided a maximum amount Mount Storm could order in any given month, it did not provide a minimum. (Id.).

Pursuant to the Coal Consulting Agreement, Dominion advised and assisted Mount Storm in administering and enforcing the Synfuel Feedstock Agreement. (R. 27 at ¶22); (R. 29 at 164:14-168:7). This included scheduling and monitoring orders and deliveries, and assisting Mount Storm in enforcing any defaults under the Synfuel Agreement. (Id.). With regard to defaults, the Synfuel Feedstock Agreement, like the Primary Supply Agreement, provided for early termination if Buffalo Coal became insolvent or unable to pay its debts when due. (R. 34 at §§9.1(d), 9.2(a), and 1.1(c)); (R. 33 at §§9.1(d), 9.2(a), and 1.1(c)).

### D. Termination of the Primary Supply Agreement and Synfuel Feedstock Agreement

By letter dated February 22, 2006, Dominion terminated its Primary Supply Agreement with Buffalo Coal (R. 9). In the letter, Dominion cites Buffalo Coal's insolvency and inability to pay debts when due as the basis for Dominion's early termination pursuant to the Primary Supply Contract. (Id.). On the same day, Dominion informed Mount Storm

5

of its termination of the Primary Supply Contract and stated that Mount Storm would no longer be receiving coal from Buffalo Coal. (R. 11). Shortly thereafter, under Dominion's direction, Mount Storm terminated the Synfuel Feedstock Agreement. (R. 15). This chronology is recorded mostly in e-mail communications between the entities involved on the morning of February 23, 2006.

First, at 7:41 a.m., Mount Storm's Kirby Martin ("Martin") sent an e-mail to colleagues, including Keith Kriebel ("Kriebel"), counsel for Mount Storm. (R. 11). In the e-mail, Martin related that Ben Baughan ("Baughan"), Senior Fuel Supply Coordinator for Dominion, just notified him that "Dominion [had] cancelled their [Primary Supply Contract] with Buffalo Coal Company [the day before]." (Id.). Moreover, Martin related that "Dominion [had] informed Tom Dimuzio [sic] [, the synfuel plant operator for PACE,] that he would no longer receive any coal from Buffalo for the synfuel plant." (Id.). In concluding the e-mail, Martin requested that Kriebel "please provide us with any required documentation . . . to formally cancel the [Synfuel Feedstock Agreement] with Buffalo." (Id.).

Approximately three hours later, at 10:43 a.m., Baughan sent an e-mail to his colleagues at Dominion to inform them that he "just spoke with [Martin] and advised him that the Buffalo contract had been terminated, effective yesterday." (R. 10). Baughan related that he also told Martin about advising "Tom DiMuzio of this decision late yesterday afternoon." (Id.). Baughan then mentioned that two deliveries "were made very early today to the synfuel plant by Buffalo" and explained that "[i]t is possible that the fax notices were not received by [Buffalo Coal] yesterday evening in time for Dominion's decision to be communicated to . . . operating personnel . . . prior to the two shipments being made this

6

morning." (Id.).

Shortly thereafter, at 10:50 a.m., Martin sent an e-mail to representatives of Dominion, including Baughan (R. 36). Martin requested that Dominion "furnish [Mount Storm] with any required documentation relative to [terminating the Synfuel Feedstock Agreement." (Id.).

Next, at 11:40 a.m., Kriebel, counsel for Mount Storm, sent an e-mail to Martin with questions regarding Martin's 7:41 a.m. e-mail (R. 12). Specifically, Kriebel asked, "[O]n what grounds did Dominion 1) terminate their contract with Buffalo, and 2) tell PACE that they wouldn't accept synfuel made from Buffalo coal?" (Id.). Kriebel then stated his inaccurate belief that Mount Storm would "have to wait until there was an actual event of default (which would include Buffalo's bankruptcy)." (Id.). Kriebel concluded that he would "still like to know how Dominion can just shut off the Buffalo supply." (Id.).

At 12:17 p.m., in response to Kriebel's questions, Martin forwarded his 7:41 a.m. e-mail as well as Kriebel's 11:40 a.m. response e-mail to Keith Carney ("Carney"), Fuels Contract Administrator III for Virginia Power Energy Marketing, Inc., an affiliate of Dominion (R. 12). Martin asked Carney to provide him with the information needed to answer the questions posed by Kriebel.

Later that day, at 5:43 p.m., Tracey McClung ("McClung") of Dominion sent an-email to Martin and Clarence Perkinson ("Perkinson") of Magellan Resources, the parent company of Mount Storm (R. 13). McClung attached to the e-mail a form letter, with an effective date of February 23, 2006, for Mount Storm to use in terminating the Synfuel Feedstock Agreement. (Id.). McClung further advised Perkinson and Martin to print a copy of the letter on letterhead, have Martin sign it, fax copies to Buffalo Coal, and mail the

7

original to Gerald Ramsburg, the principal of Buffalo Coal. (Id.).

The next day, on February 24, 2006, Buffalo Coal shut down its mining facilities, terminated its employees, and ceased all operations on a permanent basis. (R. 37); (R. 38). A week later, on March 3, 2006, Martin sent the termination letter to Buffalo Coal. (R. 15). The letter remained dated for February 23, 2006.

## II.	Procedural History

On May 5, 2006, Buffalo Coal filed for Chapter 11 bankruptcy, which was converted to a Chapter 7 bankruptcy on June 13, 2007. On September 10, 2007, John W. Teitz (the "Trustee") was appointed as the Chapter 7 trustee to administer Buffalo Coal's bankruptcy estate.

On May 5, 2008, the Trustee filed a complaint against Dominion in the bankruptcy court, commencing the adversary proceeding that is the subject of this appeal. The complaint alleges that, in connection with Dominion's termination of the Primary Supply Agreement, Dominion tortiously interfered with the related, parallel Synfuel Feedstock Agreement between Mount Storm and Buffalo Coal. Dominion filed a timely answer to the complaint.

On October 27, 2009, Dominion filed a motion for summary judgment, asking that the bankruptcy court dismiss the Trustee's tortious interference claim on several grounds. One of these grounds consisted of an argument that the "honest advice" privilege provided Dominion with a complete defense.

On January 26, 2010, the bankruptcy court granted summary judgment against the Trustee on his tortious interference claim (R. 48). In so doing, the bankruptcy court found that Dominion had satisfied the "honest advice" privilege. (Id. at 4-9). First, the court found

that Section 6.3(e) of the Coal Consulting Agreement, which requires Dominion to assist Mount Storm in "other enforcement actions," was sufficiently broad to include the assistance Dominion provided Mount Storm in terminating the Synfuel Feedstock Agreement. (Id. at 6). Second, the court found Dominion's advice regarding the insolvency of Buffalo Coal to be "honest," though Dominion's statement that no more coal would be delivered proved to be ill-informed, ill-advised, or even negligent. (Id. at 8-9). As a result, the court dismissed the tortious interference claim and, after noting that all other claims had been settled, stated its intention to enter a separate order dismissing the adversary proceeding. (Id. at 9). The debtor appeals.

## DISCUSSION

### I. Standard of Review

The district court sits as an appellate court in bankruptcy pursuant to 28 U.S.C. § 158(a), and reviews a bankruptcy court's summary judgment ruling *de novo*. **United Rentals v. Angell**, 592 F.3d 525, 530 (4th Cir. 2010).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *see* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 250 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial-- whether, in other

9

words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. In undertaking this inquiry, the Court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." ***Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 587 (1986); *see also* ***E.E.O.C. v. Navy Federal Credit Union***, 424 F.3d 397, 405 (4th Cir. 2005).

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." ***Matsushita***, 475 U.S. at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; ***Celotex Corp.***, 477 U.S. at 323-25; ***Anderson***, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." ***Anderson***, 477 U.S. at 249 (citations omitted).

## II. Analysis

The debtor raises two issues on appeal, namely: (1) whether the bankruptcy court erred by not inferring from e-mail communications among the companies that Dominion, not Mount Storm, terminated the Synfuel Feedstock Agreement; and (2) whether the bankruptcy court erred by finding the "honest advice" privilege satisfied.

### A. The Debtor Has Failed to Present Any Reasonable Inferences that Would Lead to a Recovery on its Tortious Interference Claim.

The debtor contends that the bankruptcy judge erred in determining that Dominion merely assisted Mount Storm in terminating the Synfuel Feedstock Agreement. Specifically,

10

the debtor argues that the bankruptcy court failed to draw all reasonable inferences in its favor. For the reasons that follow, this Court concludes that the debtor has failed to present any reasonable inferences that would lead to a recovery on its tortious interference claim.

### 1. Dominion's Reference to Its Termination of the "Buffalo Contract"

On February 23, 2006, at 10:43 a.m., Dominion's Ben Baughan sent an e-mail to his colleagues at Dominion to inform them that he just spoke with Mount Storm's Kirby Martin and "advised him that the *Buffalo contract* had been terminated, effective yesterday." (R. 10) (emphasis added). The debtor argues that the bankruptcy court should have inferred that Baughan was referring to Dominion's termination of the Synfuel Feedstock Agreement. This Court disagrees.

The inference for which the debtor argues is unreasonable based upon undisputed facts. First, the Baughan e-mail is addressed exclusively to Dominion employees. As a such, there was no need to qualify which Buffalo contract Baughan was describing. Moreover, in an e-mail among Mount Storm representatives, Martin related how Baughan had notified him that "Dominion cancelled *their* Coal Supply Contract with Buffalo Coal Company . . .." (R. 11) (emphasis added). Thus, even the recipient of Baughan's notification understood he was referring to Dominion's termination of the Primary Supply Agreement. For these reasons, an inference that Dominion admitted terminating the Synfuel Feedstock Agreement is unreasonable. Accordingly, the bankruptcy court did not err by failing to draw such an inference.

### 2. Dominion's Statement that Mount Storm "Would No Longer Receive" Coal from the Debtor

On February 26, 2006, at 7:41 a.m., Martin sent an e-mail to his Mount Storm

11

colleagues, including Mount Storm's attorney, relating that "Dominion [had] informed Tom Dimuzio [sic] [, the synfuel plant operator for PACE,] that *he would no longer receive* any coal from Buffalo for the synfuel plant." (R. 11). The debtor argues that the bankruptcy court should have inferred that this was a declarative statement, prohibiting the synfuel plant from further receiving coal from the debtor. This Court disagrees.

The inference for which the debtor argues is unreasonable based upon undisputed facts. First, Martin himself characterizes the statement as informative: "Dominion *informed* [the synfuel plant operator] that he would no longer receive any coal from Buffalo . . .." (R. 11). Then, in an Aril 22, 2009, deposition, Martin reiterates his understanding that the statement was informative:

> Q. Why was Mount Storm Coal Supply terminating that agreement as of the morning of February 23, 2006?
>
> A. We weren't going to receive any more coal. There was no reason to have a contract.
>
> Q. So is it fair to say that when you learned that Dominion advised your synthetic fuel plant operator that it would not receive any more coal, that is the impetus for your decision to terminate the contract with Buffalo; is that correct?
>
> [Objection]
>
> Q. Please answer the question.
>
> A. As far as I recall, that was certainly a reason.

(R. 29 at 104:10-22).

On February 23, 2006, and more than three years later, Martin, the first person informed of Dominion's statement to the synfuel plant operator, understood the statement to be informative. In fact, nothing in the record indicates that the statement was declarative

or prohibitive. The only reasonable inference is that the statement was informative based upon Dominion's understanding concerning Buffalo's insolvency and impending bankruptcy as well as its own contract termination.[1] For these reasons, an inference that Dominion prohibited the synfuel plant from receiving any more coal from the debtor is unreasonable. Accordingly, the bankruptcy court did not err by failing to draw such an inference.

### 3. "Shut Off" Comment by Mount Storm's Counsel

On February 23, 2006, at 11:40 a.m., Keith Kriebel, counsel for Mount Storm, responded to Martin's 7:41 a.m. e-mail (R. 12). At the end of his e-mail, Kriebel stated that he would "still like to know how Dominion can just *shut off* the Buffalo supply." (Id.) (emphasis added). The debtor argues that this statement supports an inference that Dominion terminated the Synfuel Feedstock Agreement. This Court disagrees.

The inference for which the debtor argues is unreasonable based upon undisputed facts. First, Kriebel's comment is in response to Martin's e-mail in which Martin relates that "Dominion *informed* [the synfuel plant operator] that he would no longer receive any coal from Buffalo . . .." (R. 11). As explained above, the reasonable inference from the record is that Dominion's statement was informative, not declarative or prohibitive. Thus, if Kriebel's comment refers to Dominion's statement to the synfuel plant operator, the comment is based upon a misinterpretation of Martin's e-mail. In fact, Kriebel apparently interpreted Martin's e-mail to mean that Dominion told the synfuel plant operator that

---

[1] In fact, the debtor assumes the informative nature of Dominion's statement when it argues that the "honest advice" privilege is inapplicable because Dominion stated that the synfuel plant would be receiving no more coal, *information* which turned out to be inaccurate. Dominion's statement could not have been simultaneously informative and declarative.

13

*Dominion* would no longer accept synfuel produced with Buffalo coal, a conclusion that no one else involved has reached. (See R. 11) ("[O]n what grounds did Dominion . . . tell [the synfuel plant operator] that they wouldn't accept synfuel made from Buffalo coal?"). Moreover, the context of Kriebel's e-mail indicates that Kriebel may have been referring to Dominion's termination of the Primary Supply Agreement. Kriebel inquired as to the basis upon which Dominion relied to terminate the Primary Supply Agreement, implying incorrectly that only the debtor's actual filing of bankruptcy would constitute an event of default. Thus, the "shut off" comment could have been an extension of Kriebel's curiosity regarding the basis upon which Dominion relied to terminate the Primary Supply Agreement so that the same could be used to terminate the Synfuel Feedstock Agreement. Therefore, Kriebel's comment can be explained as either a misinterpretation of Martin's e-mail or a curiosity regarding Dominion's basis for terminating the Primary Supply Agreement. These are reasonable inferences. That Dominion actually "shut off" the supply of Buffalo coal to the synfuel plant is not. Accordingly, the bankruptcy court did not err by failing to draw such an inference.

  **B. The Bankruptcy Court Correctly Found the "Honest Advice" Privilege Satisfied.**

Next, the debtor contends that the bankruptcy court erred by finding the "honest advice" privilege satisfied. In support of this contention, the debtor argues that Dominion's "advice" was neither within the scope of Mount Storm's request nor "honest," two requirements necessary for the privilege to apply. *See* **Torbett v. Wheeling Dollar Sav. & Trust Co.**, 173 W.Va. 210, 314 S.E.2d 166 (1983); RESTATEMENT (SECOND) TORTS § 772 (1979). For the reasons that follow, this Court concludes that the bankruptcy court correctly

14

found the "honest advice" privilege satisfied.

### 1. Dominion's Advice was Within the Scope of Mount Storm's Request.

The debtor argues that Dominion failed to show its advice was within the scope of Mount Storm's request or, in this case, contemplated in the Coal Consulting Agreement between Dominion and Mount Storm.[2] This Court disagrees.

The bankruptcy court correctly found that Dominion's advice fell within its obligations under the Coal Consulting Agreement. Section 6.2(a) obligates Dominion to provide Mount Storm with information regarding coal supply sources, section 6.3(c) provides that Dominion shall consult on a regular basis with Mount Storm concerning the coal it acquires, and section 6.3(e) requires Dominion to assist Mount Storm in administering supplier contracts, including enforcement actions under those contracts. Specifically, section 6.3(e) states that "[Dominion] shall assist [Mount Storm] in administering the Supplier Contracts, *including* scheduling . . . orders and deliveries . . ., pricing determinations, arbitrations, and *other enforcement actions* under or pursuant to such coal contracts." (R. 28 at §6.3(e)) (emphasis added). Like the bankruptcy court, this Court finds section 6.3(e) sufficiently broad as to incorporate the assistance Dominion provided Mount Storm in the latter's termination of the Synfuel Feedstock Agreement. Specifically, section 6.3(e), as read in conjunction with the rest of section 6 (titled "Coal Consulting Services"), contemplates Dominion's communications to Mount Storm regarding its termination of the Primary Supply

---

[2]Insofar as the Court has already concluded that the bankruptcy court reasonably inferred that Dominion did not, itself, terminate the Synfuel Feedstock Agreement, the Court needs to address only whether the advice given to Mount Storm was contemplated in the Coal Consulting Agreement.

Agreement, Dominion's communication that Mount Storm would no longer be receiving coal from the debtor, and Dominion's instructions regarding the termination of the Synfuel Feedstock Agreement.[3]

### 2. Dominion's Advice was Honest.

The debtor argues that Dominion failed to show its advice was "honest" because its statement that the synfuel plant "would no longer receive any coal from Buffalo . . .." turned out to be inaccurate. In support of this argument, the debtor emphasizes that the synfuel plant received two deliveries the morning after Dominion advised no more would be made. Thus, the debtor argues, the privilege is lost. This Court disagrees.

In rejecting this argument below, the bankruptcy court accurately explained that advice does not have to be correct, but honest. As outlined in Restatement (Second) Torts § 772, these are two separate defenses:

> One who intentionally causes a third person not to perform a contract . . . does not interfere improperly with the other's contractual relation, by giving the third person
>
> (a) truthful information, *or*
>
> (b) honest advice within the scope of a request for the advice.

(Emphasis added); *see also* **Tiernan v. Charleston Area Med. Ctr., Inc.**, 203 W.Va. 135, 506 S.E.2d 578 (1998) (the "honest advice" privilege does not require "truthful information").

Unlike truthful information, honest advice can be ill-informed, ill-advised, or even

---

[3]Moreover, Mount Storm's Kirby Martin testified that Mount Storm relied on Dominion to administer its coal supply contracts from "cradle to grave" and that he expected Dominion to assist in enforcement actions, including termination. (R. 29 at 165-167).

negligent. See ***J.D. Edwards & Co. v. Podany***, 168 F.3d 1020, 1022 (7th Cir. 1999). Without such protection, there would exist "a large, dark cloud over the consulting business . . .." ***Id.*** Here, Dominion reasonably believed[4] the debtor was insolvent and unable to pay debts when due. Relying upon these bases, which represent events of default under the Primary Supply Agreement, Dominion terminated its own contract with the debtor. Aware that the Synfuel Feedstock Agreement contained identical events of default and early termination provisions, Dominion advised Mount Storm regarding early termination. That the debtor made two deliveries after Dominion had informed the synfuel plant operator otherwise does not destroy the honesty of Dominion's advice. This is especially true in light of the fact that the two deliveries were likely made before Dominion's decision to terminate the Primary Supply Agreement had been communicated to Buffalo Coal's operating personnel. (See R. 10). As such, the bankruptcy court properly found the "honest advice" privilege satisfied.

## **CONCLUSION**

For the foregoing reasons, the Court finds that the bankruptcy court's decision should be, and hereby is, **AFFIRMED**. It is further **ORDERED** that this appeal should be, and hereby is, **DISMISSED** and **STRICKEN** from the active docket of this Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein and to the Clerk of the United States Bankruptcy Court for the Northern District of West Virginia.

---

[4]The debtor does not dispute that it was forced to cease operations as a direct result of Dominion's termination of the Primary Supply Agreement. (See R. 37 at 306:1-308:19).

17

**DATED**: May 27, 2010.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE